

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00233-CV

———————————————

IN THE GUARDIANSHIP OF N.P., AN INCAPACITATED PERSON

On Appeal from Probate Court No. 2
Tarrant County, Texas
Trial Court No. 2018-GD00257-2

Dissenting Memorandum Opinion by Chief Justice Sudderth

## DISSENTING MEMORANDUM OPINION

Leading questions with "yes" or "no" answers do not clear and convincing evidence make. At least that is what the trial judge—who was the sole judge of the credibility of the witnesses and weight to be given their testimony—determined. Because I would not disturb the trial court's assessment of the weight of the evidence on appeal, I respectfully dissent.

Because guardianship is a judicial process by which citizens may be deprived of their rights and liberties, the Texas Legislature has enacted a protective statutory scheme with two major obstacles to obtaining full guardianship over a proposed ward. First, proof of certain essential findings must be by clear and convincing evidence.[1] Second, before a guardian may be appointed—indeed, at all stages of the proceedings, even after a guardianship has been approved—the court is required to determine whether less restrictive alternatives to a full guardianship exist that would avoid the need for a full guardianship.[2]

---

[1]For example, prior to appointing a guardian for a proposed ward, the court must find by clear and convincing evidence that the proposed ward is incapacitated, that appointment of a guardian would be in the proposed ward's best interests, and that the appointment of a guardian would protect the proposed ward's rights or property. Tex. Est. Code Ann. § 1101.101(a)(1)(A–C).

[2]Before appointing a guardian, the court must find by clear and convincing evidence that "alternatives to guardianship that would avoid the need for the appointment of a guardian . . . and . . . supports and services available to the proposed ward that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible." Tex. Est. Code Ann. § 1101.101(a)(1)(D–E); *see id.* § 1151.351 (requiring supports and services to be

The statutory scheme makes sense. Certainly, the removal of a person's fundamental rights is of such weight and gravity that due process should require an applicant to justify, in a clear and convincing manner, that nothing short of a full guardianship is needed before a proposed ward is permanently deprived of her rights. Clear and convincing proof is that "degree of proof which will produce in the mind of [the factfinder] a firm belief or conviction as to the truth of the allegations sought to be established." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

By adopting the clear and convincing standard in these proceedings, the legislature deliberately imposed a stringent burden of proof on the applicants here to establish that the permanent removal of N.P.'s right to vote, marry, and operate a motor vehicle would be in her best interest and would serve to protect her rights or property. The burden of proof fell to the applicants to offer clear and convincing proof,[3] and it was the duty of the judge to hold the applicants to the standard

considered when the guardian communicates the ward's Bill of Rights to the ward); § 1054.104 (requiring supports and services to be considered during court visits); § 1201.052 (requiring supports and services to be considered during the court's annual review).

[3]The majority's observation that many courts in Texas have promulgated checklists and other procedures to ensure that guardianship proceedings be "smooth and expeditious" does not abrogate the need to provide the requisite proof. "Everybody else is doing it" is not a substitute for following the standards imposed by law.

imposed by law.[4]  Here, having found that the applicants had failed to discharge their burden of proof as to N.P's right to vote, marry, and operate a motor vehicle, the court declined to award a full guardianship and instead elected a limited guardianship allowing N.P. to retain her right to vote, marry, and operate a motor vehicle.

As proof with regard to these three rights, the trial court had before it the following evidence:  (1) testimony of Father, (2) testimony of Mother, (3) N.P.'s own testimony, (4) Dr. Nagireddy's Certificate of Medical Examination, and (4) Dr. Nagireddy's affidavit.  While all four provide some evidence, in the form of opinions, that N.P.'s right to vote, marry, and operate a motor vehicle should be removed, none provide any underlying facts or reasons to support the opinions offered.[5]

As to Father's testimony, he provided only the barest and most minimum of evidence, all of which was elicited from leading questions to which Father simply testified "yes":

> Q:  Do you also concur with Dr. Nagireddy that your daughter should retain no rights, including the right to vote, determine whether she gets married, determine her residence or operate a motor vehicle; do you concur with that?

[4]Likewise, the majority's observation that, according to Estates Code Section 1055.101, the rules relating to witnesses and evidence in guardianship proceedings are applied only "to the extent practicable" is misplaced.  Tex. Est. Code Ann. § 1055.101.  The clear and convincing standard of proof is not a mere rule of evidence or procedure; it is the law, and it should be applied whether practicable or not.

[5]Nor was any evidence offered of "recurring acts or occurrences in the preceding six months" related to N.P.'s capacity to vote, to marry, or to operate a motor vehicle.  *See* Tex. Est. Code Ann. § 1101.102.

A: Yes.

. . . .

Q: And in fact, if you told her to do something and she said yes, would you say that she's just a passive participant and doesn't fully understand what she's consenting to?

A: Yes.

. . . .

Q: And she is not able to independently vote without undue influence. Is that correct?

A: Yes.

. . . .

Q: And do you also agree with the doctor that your daughter cannot . . . make personal decisions regarding residence, voting, operating a motor vehicle, or marriage?

A: Yes.

Mother's testimony was even more truncated:

Q: Did you understand all the answers that your husband gave?

A: Yes, sir.

Q: If I ask you those same questions, or they ask you those same questions, would your answers be substantially the same?

A: Yes.

And, as to these three specific rights—the right to vote, the right to marry, and the right to operate a motor vehicle—N.P.'s testimony provided even less information. At best, N.P. provided no testimony about these three rights specifically

5

and only general evidence indicating that she needed her family's support to make "the right decisions":

> Q: . . . So since you've turned 18 - -
>
> A: Yes.
>
> Q: Okay. You are an adult.
>
> A: Yes.
>
> Q: And did you know that you can do what you want?
>
> A: Yeah, but I can't.
>
> Q: Oh, but you can't? Why can't you?
>
> A: Because I don't think I would make the right decisions.
>
> Q: You don't believe that you would make the right decisions?
>
> A: No. I don't think I would.
>
> . . . .
>
> Q: Okay. And do you want this judge, Judge Allen here, today, to grant this guardianship - -
>
> A: Yes.
>
> Q: - - that would appoint your mom and dad to be your guardian?
>
> A: Yes.
>
> Q: . . . And why do you want them to be your guardian?
>
> A: Because I'm not capable of doing things without my family.

While the Certificate of Medical Examination carried with it the imprimatur of a medical doctor, on the issue of whether N.P.'s rights to vote, to marry, or to operate

a motor vehicle should be removed, Dr. Nagireddy's conclusions were likewise cursory. At one place in the form, Dr. Nagireddy simply responded with check marks to the following prompt: "Is the Proposed Ward <u>able to initiate and make responsible decisions</u> concerning himself or herself regarding the following." As to the three categories, "Safely operate a motor vehicle," "Vote in a public election," and "Make decisions regarding marriage," Dr. Nagireddy checked "No." At a second place on the form, Dr. Nagireddy checked a box labeled, "Total" to indicate that "The Proposed Ward is totally without capacity (1) to care for himself or herself and (2) to manage his or her property."[6] And, finally, in Dr. Nagireddy's affidavit, the doctor averred that, "Based on my medical expertise and to a reasonable medical probability, without a guardian, I do not believe that there are available supports and services that would enable [N.P.] to . . . (d) make personal decisions regarding residence, voting, operating a motor vehicle, or marriage."

The evidence recited above was all that was offered to support the divesting of N.P. of her rights to vote, to marry, and to operate a motor vehicle. Even looking at the evidence in light most favorable to the applicants, rather than the factfinder (which would reverse the standard of review on appeal), I have no difficulty

---

[6]As the majority points out, at one place on the form, Dr. Nagireddy checked two contradictory boxes in error, rather than correctly choosing between two options, but the majority did not find the error to be "material." While it might not be material to the issues before us, it does highlight the hazards of checklist evidence and might give a trial judge pause to consider the reliability of other evidence provided through check marks on the same document.

understanding how, at the conclusion of the hearing, the trial court was not persuaded by clear and convincing evidence of the need to divest N.P. of her right to vote, or of her right to marry, or of her right to operate a motor vehicle.[7]

As to the issue of supports and services, the entire guardianship process is premised on the concept that courts must seek any less restrictive alternatives, both formal and informal, to full guardianship if supports and services exist and are feasible.[8] Tex. Est. Code Ann. § 1001.001. In this case, supports and services means resources and assistance—both formal and informal—that would enable N.P. to make personal decisions regarding voting, marrying, and operating a motor vehicle.[9] *Id.* § 1002.031. By requiring judges to consider supports and services alternatives before ordering a full guardianship, the law juxtaposes the desire to protect a

---

[7]To the extent that the majority faults the trial judge for not "closely question[ing]" the witnesses here, the majority misplaces the burden of providing clear and convincing evidence. The burden is not on the judge to supply the evidence. Moreover, the judge is not an advocate and should not be faulted for not acting like one.

[8]The majority observes that "[n]o witness or report or medical examination suggested that anything less than a full guardianship of the person would be appropriate for [N.P.] or that any feasible alternatives to guardianship or feasible supports and services existed that would avoid the need for a full guardianship." With respect, that also reverses the burden of proof.

[9]At best, under the limited guardianship N.P. could only *attempt* to operate a motor vehicle. The legal operation of a motor vehicle requires a license. To receive a Texas driver's license, N.P. would have to take and pass both "knowledge and driving tests." Tex. Dep't of Public Safety, *How to Apply for a Texas Driver License*, https://www.dps.texas.gov/driverlicense/applyforlicense.htm (last visited Dec. 4, 2020).

proposed ward from making bad or harmful decisions against the right of an individual to self-determination, the freedom of choice, and the opportunity for human development through learning from decisions made. Full guardianship contradicts the promotion of self-determination as well as the development of the skills necessary for self-determination. And achieving the right balance between these competing desires—the desire to prevent harm and the desire to foster self-determination—is of critical importance because, in reality, once a full guardianship is established, it is unlikely, if not impossible, to undo it.

The law recognizes that with support and guidance from others, even those with severe intellectual disabilities might be able to make some choices and decisions for themselves and, if so, should be allowed to do so. Family members, friends, and trusted advisors are a type of informal supports and services and, in fact, are the type of supports and services that everyone in society who cares about making sound choices uses from time to time. Just as individuals without intellectual disabilities often consult family members, friends, or trusted advisors in making important life decisions, those with intellectual disabilities should be allowed to do so before their decision-making rights are permanently stripped from them.

Contrary to Dr. Nagireddy's opinion that there were no available supports and services that would enable N.P. to make decisions about voting, marrying, or operating a motor vehicle, the record established that N.P. has available supports and services to her. N.P. acknowledged that she needed help from her family to make

9

good choices. Her appreciation for the need of assistance from her family in this regard, combined with her family's obvious willingness to provide such assistance, is evidence that supports and services—albeit unstructured and informal—are currently available as an alternative to full guardianship.

I take particular issue with regard to N.P.'s right to vote. The right to vote is a precious one; permanent disenfranchisement should not be imposed on such meager evidence as was provided here. As to Father's "yes" answer to the question of whether N.P. is not able to independently vote without undue influence, I would postulate that most voters, at some point, have discussed with others (including family members or trusted friends) how they will vote and why. Given N.P.'s testimony that she relies on her family to help her make good decisions, I would expect her to do the same. Seeking and considering such input and advice does not mean that the voter is not "independently vot[ing] without undue influence." It simply acknowledges that voters make informed decisions of this nature by considering the opinions of those they trust. If it were not so, then why would candidates and causes seek endorsement from influential members of the community?

That this was an uncontested case should not relax these standards. Indeed, in such circumstances, heightened vigilance might be required to ensure that a proposed ward's rights are not being trampled upon by those who—even with laudable and benevolent motivations and with sincere conviction that full guardianship is necessary to protect the proposed ward from harm—would seek to exercise more control over

an individual than the law or evidence allows.[10]  In these proceedings, when the stakes are so high, the trial court rightfully acts as a gatekeeper, and I cannot fault the trial court here for assuming that role.

Because there is some evidence supporting the trial court's determination that alternatives to a full guardianship were both feasible and available, and because the evidence offered was scant, thus supporting the trial court's determination that the clear and convincing burden of proof had not been met, I would hold that the trial court did not abuse its discretion by granting a limited guardianship in lieu of a full one as to N.P.'s right to vote, to marry, and to operate a motor vehicle.

Because the majority holds otherwise, I respectfully dissent.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered:  December 10, 2020

---

[10]Indeed, Dr. Nagireddy recommended that N.P. not attend the guardianship hearing at all, opining that she would not be able to "attend, understand, and participate" in it.  The record belies this opinion and provides an example of why the trial court cannot relax standards and accept all evidence offered as true just because no one argued the point.